IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

ANGELA CABLE (2),

Defendant.

CRIMINAL ACTION FILE
NO. 1:21-CR-0426-MLB-JEM-2

UNITED STATES MAGISTRATE JUDGE'S ORDER AND
NON-FINAL REPORT AND RECOMMENDATION

Cable has filed three motions pending before the Court: (1) a motion to reveal the deal, (Doc. 353); (2) a motion to reveal confidential source, (Doc. 354); and (3) a motion to suppress geolocation data and related evidence, (Doc. 356).[1] For the following reasons, the Court **ORDERS** that Cable's motion to reveal the deal, (Doc. 353), be **DENIED**. The Court further **RECOMMENDS** that the motion to reveal confidential source, (Doc. 354), and motion to suppress geolocation data and related evidence, (Doc. 356), be **DENIED**.

---

[1] In addition, Cable has filed a motion to suppress the search and seizure of her home, (Doc. 357), a motion to suppress the search and seizure of her cell phone, (Doc. 358), and a motion to suppress her statements, (Doc. 359). Cable, however, subsequently moved to withdraw all three motions. (Doc. 380.). This Court **GRANTS** Cable's motion to withdraw each of the three motions, (Doc. 380). Further, Cable has filed a motion to sever, (Doc. 353), and a motion to allow participation in voir dire, (Doc. 355). Both motions, (Docs. 353, 355), are **DEFERRED** to the District Judge for adjudication.

## I.      FACTUAL BACKGROUND

On October 27, 2021, a federal grand jury returned a nine-count indictment, charging 15 defendants with drug trafficking and firearm offenses. (Doc. 18.) Cable was charged in count one with conspiring to possess with intent to distribute methamphetamine, in violation of 21 U.S.C. § 846, and in count two with possessing with the intent to distribute at least 50 grams of methamphetamine, in violation of 21 U.S.C. § 841. (*Id.*). After Cable filed the three pending motions, (Docs. 353, 354, 356, 470), the government responded on July 26, 2023, (Docs. 499, 500, 501), and Cable replied on August 10, 2023, (Doc. 503). The matters are now fully briefed and ripe for review.

### A.      Factual Allegations

The charges in the indictment arise from a Drug Enforcement Administration (DEA) investigation of a drug trafficking organization (DTO) in which individuals incarcerated in Georgia state prisons allegedly used contraband cell phones to broker deals to distribute methamphetamine and marijuana in the Atlanta area.[2] (Doc. 499 at 1-2.) The government alleges that the prisoners were aided by their girlfriends — including Cable — and others outside of the prisons. (*Id.* at 1-2.)

In January 2020, a Source of Information (SOI) told DEA agents in Kentucky that s/he had previously purchased kilogram quantities of methamphetamine from the DTO. (*Id.* at 2.) On January 22, 2020, the SOI made a

---

[2] Only to provide background information, the Court recounts the alleged facts provided in the government's brief. (Doc. 499.)

recorded phone call to Cable, and while on the phone with the SOI, Cable made a three-way call to Ruiz, who was using a contraband cellphone in prison. (*Id.*) Ruiz and the SOI then discussed a deal for ten "big tires," which agents believe is code for methamphetamine, agreed to a price of $5,000 per kilogram, and Ruiz said he would reach out in a few weeks. (*Id.*)

Approximately three weeks later, on a recorded call that took place on February 12, 2020, the SOI and Cable discussed the SOI purchasing three kilograms of methamphetamine on February 14, 2020, and Cable told the SOI that she would have Ruiz contact him or her directly. (*Id.* at 2-3.) In another recorded call on February 12th, the SOI and Ruiz talked directly and confirmed the purchase for February 14th. (*Id.* at 2-3.) Sometime that day, the SOI introduced a Confidential Source (CS) to Ruiz, and the CS and Ruiz then exchanged multiple recorded calls and text messages coordinating the three-kilogram purchase. (*Id.* at 3.) Ruiz directed the CS to meet at 1860 Atkinson Road NW, Lawrenceville, Georgia, and the CS and an undercover agent went to that location in an undercover vehicle. (*Id.*) There, the CS met a drug courier and purchased over 2.736 kilograms of pure methamphetamine, which he immediately turned over to the agents. (*Id.*)

Next, again directed by DEA agents, the CS made a recorded phone call to Ruiz on March 24, 2020. (*Id.* at 3.) During this call, the CS and Ruiz arranged for the CS to purchase one kilogram of methamphetamine for $5,000. (*Id.*) The CS made additional recorded phone calls to Ruiz on March 26th and March 27th, coordinating the transaction. (*Id.*) On March 27th, Ruiz sent a text message to the

CS providing a meeting location of 2345 Cobb Parkway SE, Smyrna, Georgia, and later that afternoon, the CS received 699.1 grams of pure methamphetamine in exchange for $5,000. (*Id.* at 3-4.)

The CS and SOI were not involved in the government's investigation after March 2020. (*Id.* at 4.)

### B.   Geolocation Search Warrant

On January 30, 2020 — eight days after the SOI and Cable first spoke on the telephone — DEA Special Agent Bryan Tice applied for a search warrant under 18 U.S.C. § 2703(c)(1)(A), seeking geolocation data associated with Cable's phone. (Doc. 501-1 at 16.) In his affidavit, Agent Tice stated that he believed geolocation information for Cable's cellphone would lead to evidence of, and contain evidence relating to, drug trafficking offenses under 21 U.S.C. §§ 841(a), 843(b), and 846. (Doc. 501-1.) In support of his application, Agent Tice explained that:

- DEA's investigation into the drug trafficking offenses began in or about January 2020 when it received information that an SOI had information about a DTO distributing kilogram quantities of methamphetamine and marijuana in the Atlanta area. (*Id.* at ¶ 13);

- Agents had identified Cable as "a drug coordinator and courier believed to be working on behalf of" Ruiz. (*Id.* at ¶ 14b);

- The SOI previously purchased approximately 40 kilograms of methamphetamine from this DTO. (*Id.* at ¶ 14);

- On January 22, 2020, DEA recorded a telephone call between the SOI and Cable, who was using her cellphone. (*Id.* at ¶ 15.) The SOI and Cable greeted each other, and the SOI said, "I thought I'd come down in a few in a few weeks if everything is good." Cable

responded, "Umm . . . Hold on. Let me find out. Let me try and call him." (*Id.* at ¶ 16);

- Cable then three-way called a telephone number agents believed was being used by someone known as Bori.[3] (*Id.* at ¶ 15.) Cable rejoined the SOI and said, "He answered," after which Cable connected the SOI and Bori. The SOI explained what he previously told Cable: "[I]f everything was good," he "would come down in two weeks." Bori responded, "For which one? Green or white?," to which the SOI responded, "The big tires. Big ones." Bori ultimately responded, "I'll honor the price that I gave you. Big tires are always here and on point." Agent Tice explained that, based on his training, knowledge, and experience, he believed that "green" referred to marijuana, "white" referred to methamphetamine, and "big tires" referred to kilogram quantities of methamphetamine. (*Id.* at ¶ 17a);

- The SOI then stated, "I've been getting them from out there (the Carolinas), but they haven't been that good." Bori asked, "Have they been giving you some good numbers?," to which the SOI responded, "Yeah, that's why I was calling to see if they were still the same." Bori resonded, "Yeah, what's the number? Is there something we need to do because I owe you a thousand favors." (*Id.* at ¶ 18);

- The SOI explained to Bori, "Seeing what you could do because their stuff hasn't been that good. Not like you had." Bori replied, "What did I tell you last time? 55?," and the SOI said, "No, you said 5." Bori replied, "Okay, okay. If that's what I told you. That what we are going to do. Is that a better number than they have been giving you?" The SOI stated that it was "about the same." Agent Tice explained that, based on his training, knowledge, and experience, he believed that the two individuals agreed on a purchase price of $5,000 per kilogram of methamphetamine. (*Id.* at ¶ 19);

- Next, after the SOI said, "I was going to try and come down in about two weeks if you would be alright," Bori asked, "How many tires

---

[3] Agents later concluded that Bori is Ruiz. (Doc. 501 at 3.)

are we looking at?" The SOI replied, "Ten." Bori responded, "No problem. We will get them together for you. I need to go ahead and get the prettiest cars together, wash, and clean them and have them ready for two weeks right?" The SOI agreed, and Bori said, "Okay. I'll go ahead and take care of that." (*Id.* at ¶ 20.)

Agent Tice's affidavit also explained that Cable's cellphone had contacted Bori's phone over 1,000 times from November 30, 2019 to January 28, 2020.[4] (*Id.* at ¶ 21a.) In addition, agents had intercepted, via multiple wire intercepts, Bori brokering drug transactions "multiple times a week, if not daily" on his cellphone. (*Id.*)

Agent Tice explained that he believed Cable was using her cellphone to facilitate drug transactions and further believed that "GPS data" from that phone would help law enforcement locate and identify vehicles and stash houses being used to store illegal drugs and/or drug proceeds. (*Id.* at ¶ 23.) Agent Tice also explained that he believed that GPS data would help law enforcement "keep track of locations and drug-related activities associated with Cable, and other conspirators" without exposing the investigation. (*Id.* at ¶ 24.)

The affidavit further explained the technology at play. (*Id.* at ¶¶ 26-28.) Agent Tice stated that Cable's cellphone is "equipped with technology that emits GSP data to be collected by AT&T," and that the "GPS mobile tracking equipment was factory-installed within" Cable's cellphone. (*Id.* at ¶ 26.) This tracking equipment "provides a link" between Cable's cellphone and AT&T,

---

[4] The affidavit actually reads "from November 30, 2019 to January 28, 20202," but the undersigned concludes that this is a typographical error, and that the agent meant, and the Magistrate Judge interpreted, the date to be January 28, 2020, and not 2022, given that the affidavit was submitted on January 30, 2020.

"where the GPS mobile tracking equipment generates a signal that fixes the telephone's geographic position;" the "signal is then read by a cell phone tower that transmits the location information in a form that AT&T computer systems are able to calculate and project upon a map." (*Id.* at ¶ 26.)

On January 30, 2020, a Magistrate Judge found that Agent Tice's affidavit established probable cause to believe that geolocation data from Cable's cellphone would lead to evidence regarding drug offenses, and thus authorized law enforcement to collect this data for 45 days. (Doc. 501-2.) During that time, law enforcement was able to identify Cable's residence and vehicles; learned that Cable travelled from her home to prison, where she visited Ruiz; and concluded that "Cable does not physically touch the drugs but that she meets drug couriers and then drives them to a 'stash house' to conduct drug transactions." (Doc. 501-2 at 3-4.) Law enforcement concluded that "continued monitoring of the geo-location data from [Cable's cellphone] will assist agents in locating and identifying vehicles and the locations that are being used as stash houses for illegal drugs and/or drug proceeds," and thus sought an additional 45 days' worth of geolocation data. (*Id.* at 4.) On March 17, 2020, a Magistrate Judge extended the period for obtaining geolocation data for an additional 45 days, finding that "good cause and probable cause exist to believe that continued receipt" of geolocation data "will lead to evidence" of drug trafficking violations. (Doc. 501-2.)

II.    **DISCUSSION**

    A. **Cable's Motion to Reveal the Deal**

In her motion to reveal the deal, (Docs. 353, 470), Cable asks the Court to compel the government to disclose "the existence and substance of any agreements between any co-defendant, co-conspirator or any other person in this case and any officer or agent of the Federal or State government,"(Doc. 353 at 1), including what, if anything, the SOI "received or expects to receive in exchange for his cooperation with law enforcement." (Doc. 470 at 6-8.) Cable cites *Brady v. Maryland,* 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), to support her motion. (*Id.* at 3-4.) In response, the government argues that Cable's motion constitutes "an attempt to obtain early disclosure of all *Giglio* materials." (Doc. 500 at 2.) The Court agrees.

A defendant's due process rights require the government to disclose information that is favorable to a defendant and that is material either to guilt or punishment. *Brady*, 373 U.S. at 87. Favorable evidence includes both exculpatory and impeachment evidence. *See Giglio,* 405 U.S. at 153-54. "Exculpatory or impeachment evidence is material for the purpose of *Brady* 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Breedlove v. Moore*, 279 F.3d 952, 961 (11th Cir. 2002) (quoting *United States v. Bagley*, 473 U.S. 667, 676, 682 (1985) (a "reasonable probability" is a probability sufficient to undermine confidence in the outcome.)). Certainly, any "deal" between the government and a witness could be subject to disclosure under *Brady* and *Giglio*.

Incorporating *Brady* and *Giglio's* disclosure obligations, this Court's Scheduling Order directs the government "to provide all materials and information that are arguably favorable to the defendant in compliance with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); and their progeny." (Doc. 139 at 7.) With respect to timing, the Order requires that *Brady* material "shall be provided sufficiently in advance of trial to allow a defendant to use it effectively." (*Id.*) Regarding *Giglio* material, the Scheduling Order references the *Jencks* Act, which mandates that certain witness statements must be provided to the defense after the witness has testified on direct examination. (*Id.* at 7, 10) (citing 18 U.S.C. § 3500.) The Order provides, though, that the government is "strongly encourage[d] to disclose" impeachment evidence prior to the pretrial hearing or trial in which the witness who may be impeached is scheduled to testify. (*Id.*) (explaining that impeachment material must be provided "no later than production of the *Jencks* Act statements, and providing that the government is "strong encouraged" to disclose *Jencks* Act statements prior to the any hearing.). The Order further explains that "[n]o party is required to provide a list of its witnesses in advance of trial unless otherwise compelled by law or ordered by the Court." (*Id.* at 11.)

Here, the government represents that it "is aware of its various disclosure obligations and will comply with those obligations, including providing impeachment material such as evidence relating to plea bargains or agreements of leniency with Government witnesses," and "will err on the side of producing

any *Giglio* material sooner rather than later." (Doc. 500 at 5.)[5] At this time, the Court has no reason to discredit the government's representations. Given those representations, the Court declines to order early disclosure of *Giglio* materials. Cable's motion to reveal the deal, (Doc. 353), is therefore **DENIED**.

**B. <u>Cable's Motion to Reveal Confidential Source</u>**

In her motion to reveal confidential source, (Docs. 354, 470), Cable seeks information about the SOI, arguing that, "[b]ecause the government may rely upon the testimony of the confidential source to try to establish a connection between Ms. Cable and others involved in the alleged conspiracy, the disclosure of the identity of the informant is essential to Ms. Cable's trial preparation." (Doc. 354 at 4.) Cable cites *Roviaro v. United States,* 353 U.S. 53, 59 (1957), in support of her motion. (Docs. 354, 470.) There, the Supreme Court held that the government's privilege to withhold the identity of informants from disclosure is limited, and that when "the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Roviaro*, 353 U.S. at 59 (1957). To determine when the government's privilege "must give way," courts engage in a balancing test, considering three factors: (1) the extent of the informant's participation in the criminal activity; (2) the directness of the relationship between the defendant's asserted defense and

---

[5] With respect to Cable's specific requests for codefendants' plea agreements, (Doc. 353 at 5), the government points out that the plea agreements for those codefendants who have already pleaded guilty are publicly available. (Doc. 500 at 3-4.)

the informant's probable testimony; and (3) the government's interest in nondisclosure. *United States v. Gutierrez*, 931 F.2d 1482, 1490 (11th Cir. 1991). As the Supreme Court later explained, though, "[t]he issue of evidentiary law in *Roviaro* was whether (or when) the Government is obliged to reveal the identity of an undercover informer the Government does *not* call as a trial witness." *Banks v. Dretke*, 540 U.S. 668, 697 (2004) (emphasis in original). Thus, *Roviaro* and the balancing test do not apply when the informant will testify at trial. *See United States v. Najera-Perez*, No. 1:12-CR-232-2-CAP, 2014 WL 888651, at *26-29 (N.D. Ga. Mar. 6, 2014) (denying motion for disclosure because the government indicated it would call its confidential informants as witnesses at trial, and *Roviaro* was, therefore, not applicable); *see also United States v. Kent*, No. 4:17-CR-0039-JPB-WEJ, 2019 WL 10253166, at *4 (N.D. Ga. Nov. 5, 2019), report and recommendation adopted, No. 4:17-CR-00039-06-JPB, 2020 WL 2786791 (N.D. Ga. May 29, 2020) (denying motion to compel disclosure based on government's representation that it intended to call informant as trial witness, and under local practice, all *Brady*, *Giglio,* and *Jencks* Act material related to informant would be disclosed shortly before trial, thereby alleviating the concerns present in *Roviaro*); *United States v. Covington*, No. 1:16-CR-145-15-TWT, 2018 WL 5016499, at *1 (N.D. Ga. Oct. 16, 2018) (holding that disclosure of confidential informants that the government intends to call as witnesses at trial is not required by *Roviaro*); *United States v. Pasby*, No. 1:16-CR-145-TWT-JKL(22), 2017 WL 10402560, at *11 (N.D. Ga. Oct. 4, 2017), report and recommendation adopted, No. 1:16-CR-145-22-TWT, 2018 WL 4953235 (N.D. Ga. Oct. 12, 2018) (same); *United States v. Ogletree*, No.

315CR00005TCBRGV, 2015 WL 13403895, at *2 (N.D. Ga. June 10, 2015) (same);
*United States v. Pineda*, No. 1:11-CR-00006-CAP, 2012 WL 2906758, at *44 (N.D.
Ga. June 4, 2012), report and recommendation adopted, No. 1:11-CR-0006-CAP-
JFK, 2012 WL 2907447 (N.D. Ga. July 16, 2012) (same).

Here, the government states that it intends to call both the CS and SOI as
trial witnesses, and that it will disclose their identities and provide any related
*Brady*, *Giglio,* and *Jencks* material "at the appropriate time before trial." (Doc. 499
at 6-7.) Cable's reliance on *Roviaro*, therefore, is misplaced, and Cable has not
shown that she is entitled to early disclosure of the government's witnesses, or
information related to those witnesses, on any other grounds. *See United States v.
Johnson*, 713 F.2d 654, 659 (11th Cir. 1983) ("A criminal defendant has no absolute
right to a list of the government's witnesses in advance of the trial.").

Notably, Cable's codefendants, Ruiz and Vazquez, filed similar motions to
disclose the SOI and CS's identities. *See United States v. Ruiz, et al.*, No. 1:21-cr-
426-MLB, 2023 WL 3562970 (N.D. Ga. May 19, 2023). The undersigned
recommended that those defendants' motions be denied for the same reasons
discussed above. *Id.* at *2-3. The District Judge adopted that recommendation
and denied the codefendants' motions to disclose the confidential informants.
*Id.*[6] ("This Court agrees with the Magistrate Judge and the long list of decisions

---

[6] The District Judge also found that, even considering the *Rovario* balancing
test, the Court still would not order disclosure because: (1) regarding the first
*Rovario* factor, agents either recorded, or were present for, all of the drug
transactions in which the defendants participated; (2) regarding the second
*Rovario* factor, the defendants did not identify any relationship between their
likely defense and the SOI's or confidential informant's testimony; instead, they

she cited in concluding Defendants' reliance on *Rovario* is misplaced in light of the United States's representation that it will call the CS and SOI at trial and thus will produce identifying information and related *Jenks* Act, *Brady*, and *Giglio* materials before trial.").

Accordingly, the Court **RECOMMENDS** that Cable's motion to reveal confidential source, (Doc. 354), be **DENIED.**

### C. Cable's Motion to Suppress Geolocation Data and Related Evidence

The Fourth Amendment has four requirements: (1) a search warrant must be based on probable cause; (2) that probable cause must be supported by sworn testimony or an affidavit; (3) the place to be searched must be described with particularity; and (4) the evidence to be seized must be particularly described. U.S. Const. amend. IV; *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). Cable moves to suppress geolocation data and related evidence, (Docs. 356, 470), arguing that the search warrant providing law enforcement with her geolocation data was deficient because it did not contain sufficient probable cause and was overbroad. Each argument is addressed in turn below.

#### 1. Probable Cause

First, Cable asserts that the search warrant affidavit did not contain sufficient probable cause because: (1) there was insufficient information

---

simply said that they needed the informants' identifies to "fully develop" their defense; and (3) regarding the third *Rovario* factor, the government has an interest in protecting the SOI and confidential informant. This same reasoning applies to Cable. Thus, even assuming that the *Rovario* balancing test applies, the undersigned still would recommend denying Cable's motion.

connecting Cable to Ruiz's drug trafficking; (2) the affidavit did not contain any information explaining how Cable's geolocation data would be relevant to the investigation; and (3) the affidavit "relied on statements from the source of information (SOI) without sufficient corroboration." (Doc. 356 at 2-3; Doc. 470 at 10.)

A magistrate judge issuing a search warrant must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994) (A realistic and commonsense approach encourages use of the warrant process.). Probable cause can be inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment, and normal inferences about where a criminal might hide the fruits of his crime. *See United States v. Lebowitz*, 647 F. Supp. 2d 1336, 1354 (N.D. Ga. 2009), *aff'd*, 676 F.3d 1000 (11th Cir. 2012) (citation omitted). A court reviewing the issuing court's probable cause determination employs a deferential rather than *de novo* standard of review. *Massachusetts v. Upton*, 466 U.S. 727, 728, 733 (1984) (citing *Gates*, 462 U.S. at 236; *United States v. Ventresca*, 380 U.S. 102, 108 (1965)); *Miller*, 24 F.3d at 1363 (reviewing courts owe "substantial deference to an issuing magistrate's probable cause determinations"). "Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather a realistic and commonsense approach should be employed so as to encourage recourse to

14

the warrant process and to promote the high level of deference traditionally given to [issuing judges] in their probable cause determinations." *Miller*, 24 F.3d at 1361.

First, in arguing that the affidavit contained insufficient information connecting Cable to the DTO, Cable asserts that the only time Cable is mentioned in the affidavit is when Agent Tice describes the three-way call between the SOI, Ruiz, and Cable, and that "none of the statements made during [the three-way call] suggest that Ms. Cable was involved in the drug transaction, nor in any other criminal activity." (Doc. 503 at 10) Thus, Cable argues, the affidavit shows her simply talking to a drug trafficker, and the "mere act of talking to 'known criminals' is insufficient to justify a significant invasion of her privacy." (*Id.*) But Cable misinterprets the evidence.

The evidence does not simply show probable cause that Cable *associated* with a drug trafficker on the phone; it shows probable cause that she *facilitated* a drug transaction on that phone. Notably, the SOI called Cable. (Doc. 501-1 at ¶ 16.) Then, the SOI told Cable that he wanted to "come down if everything is good," to which Cable told the SOI to "hold on" so that she could "call him" and "find out." (*Id.*). Cable then connected the SOI to Ruiz directly; once the connection was made, the SOI and Ruiz discussed exactly what types of drugs the SOI wanted to purchase from Ruiz, how many, and for how much. (*Id.* at ¶ 17a.) The affidavit further explained that the SOI had previously purchased 40 kilograms of methamphetamine from this DTO. (*Id.* at ¶ 13.) This fact was corroborated by the subsequent conversations between the SOI and Ruiz, where

it is apparent that these two had a preexisting drug trafficking relationship. (*See, e.g.*, Doc. 501-1 at ¶ 18 (Ruiz telling the SOI, "I owe you a thousand favors"); *id.* at ¶ 19 (the SOI telling Ruiz that the SOI's most recent source of supply sold drugs that were "not like you had"); *id.* at ¶ 19 (Ruiz asking the SOI what price Ruiz charged the SOI for drugs the "last time")). The fact that the SOI telephoned Cable first to organize a drug deal with someone he previously purchased drugs from provides probable cause that Cable had previously communicated with the SOI and was involved in the drug trafficking conspiracy in some way. Given this, there was ample probable cause to believe that Cable was using her cellphone to facilitate transactions involving drugs; indeed, she *did* use her cellphone to facilitate the January 22, 2020, drug transaction between the SOI and Ruiz.

That commonsense conclusion is buttressed by the fact that Cable's cellphone contacted Ruiz's phone over 1,000 times during an approximate two-month time-period, while Ruiz was intercepted brokering drug transactions "multiple times a week, if not daily," on that same phone. (*Id.* at ¶ 21a.) Given the frequent contacts between Cable and Ruiz, probable cause exists that Cable continued to use her cellphone to assist the drug trafficking organization.

Second, contrary to Cable's argument that the affidavit did not contain any information explaining how Cable's geolocation data would be relevant to the investigation, the affidavit stated precisely why that data could further the investigation: it could help law enforcement discover other coconspirators, stash houses, or other drug activities. (Doc. 501-1 at ¶ 23.)

Finally, Cable argues that the warrant was deficient in that it relied on statements from the SOI "without sufficient corroboration." (Doc. 470 at 10.) Specifically, Cable argues that the affidavit did "not include sufficient facts to establish the informant's truthfulness" because it made "no references to the informant's reliability and veracity in the past," nor did the affidavit show that the SOI's claims were corroborated. (Doc. 470 at 11.) In examining the sufficiency of an affidavit based on information provided by an informant, "the informant's 'veracity,' 'reliability,' and 'basis of knowledge' are all highly relevant." *Illinois v. Gates*, 462 U.S. 213, 230 (1983). The Supreme Court has explained that these factors are to be "understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable cause determinations." *Id.* at 233. That is, "a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.*; *see also United States v. Brundidge*, 170 F.3d 1350, 1353 (11th Cir. 1999) (finding that under the *Gates* "totality of the circumstances test," "the CI's basis of knowledge made up for any weaknesses in the CI's veracity.").

Here, while Agent Tice did not include information regarding whether the SOI had provided information in the past and whether the SOI was known to be reliable, the affidavit, taken as a whole, contains sufficient probable cause. To begin, the SOI's statements that s/he previously purchased 40 kilograms from the DTO was based on first-hand knowledge and was made against their penal interest. Such statements carry at least some inherent indicia of reliability. In

17

*United States v. Harris*, 403 U.S. 573, 583 (1973), the Supreme Court explained the reliability of such statements as follows:

> Common sense in the important daily affairs of life would induce a prudent and disinterested observer to credit [ ] statements [against penal interest]. People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility — sufficient at least to support a finding of probable cause to search.

*See also United States v. Robinson*, 202 F. App'x 434, 436 (11th Cir. 2006) ("[W]e have upheld the validity of the probable cause affidavit ... where the confidential informant made a statement against his or her penal interest to the officer....").

Next, and perhaps most importantly, the SOI's statement to law enforcement that s/he had previously purchased 40 kilograms of methamphetamine from this DTO was corroborated by the conversation during the three-way call, where the SOI's statements to both Cable and Ruiz illustrated a pre-existing relationship with them, including where Ruiz asked the SOI what price Ruiz had quoted the SOI "last time." (Doc. 501-1 at ¶ 19.) The recorded call also revealed that the SOI and Ruiz brokered a current drug transaction. (*Id.* at ¶ 20.) *See United States v. Upshaw*, No. 2:20-cr-38, 2020 WL 8484807 (11th Cir. Nov. 24, 2020) (holding that, even though the affidavit provided little information about the informant, it detailed the informant's personal observations and independent police work corroborated the informant's information, and thus, under the totality of the circumstances, sufficient probable cause supported the search warrant); *United States v. Johnson*, 444 F. App'x 424, 425-26 (11th Cir. 2011)

("[W]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant."); *United States v. Schimmel*, 317 F. App'x 906, 908 (11th Cir. 2009) (noting that, "if an informant's tip is sufficiently independently corroborated, no need exists to establish the veracity of the informant."); *United States v. Roland*, 133 F. App'x 660, 662 (11th Cir. 2005) (recognizing that the Eleventh Circuit has upheld the validity of a probable cause affidavits in different cases, where  a confidential informant made a statement against their penal interest, where the level of detail showed the informant was unlikely to lie because the lies would be discovered in short order, and where police were able to independently confirm some of the facts that the informant provided).[7]

For all these reasons, the affidavit provided sufficient probable cause to believe that Cable's geolocation data would provide agents with evidence of the DTO's activities.

## 2. **Overbreadth**

Next, Cable argues that the search warrant is overbroad and lacks specificity because it sought "all cell-site data from January 30, 2020 through May

---

[7] In her reply brief, Cable also argues that the affidavit provides "no indication of how recently or within what timeframe the SOI allegedly made a drug purchase from the DTO," and thus the issuing judge could not assess the information's "staleness." (Doc. 503 at 5.) The issuing judge, though, knew that the SOI and Ruiz struck a drug deal — a deal that was facilitated by Cable —only eight days earlier. (*See* Doc. 501-1) (warrant presented on January 30, 2020, eight days after the January 22, 2020, telephone call between Cable, the SOI, and Ruiz). Cable's staleness argument, then, is a non-starter.

2020." (Doc. 470 at 13) ("[T]he government sought to obtain Ms. Cable's entire movements for over four months based on the limited allegations against her, and without even the attempt to limit the dates whatsoever. The allegation in the affidavit that Ms. Cable is 'believed to be' a courier for Ruiz is insufficient to show that there is probable cause to get Ms. Cable's cell-site data at all – much less for over four months.").

"The Fourth Amendment requires that searches "should be as limited as possible to prevent 'general, exploratory rummaging in a person's belonging.'" *United States v. Blake*, 868 F.3d 960, 973 (11th Cir. 2017) (quoting *Coolidge v. New Hamphsire*, 403 U.S. 443, 467 (1971)). The Fourth Amendment requires a search warrant to "'particularly describe the place to be searched, and the persons or things to be seized.'" *United States v. Betancourt*, 734 F.2d 750, 754 (11th Cir. 1984) (citation omitted in original). This "requirement is aimed at preventing 'general, exploratory rummaging in a person's belongings.'" *United States v. Wuagneux,* 683 F.2d 1343, 1348 (11th Cir. 1982) (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 467 (1971)). However, the description in the warrant need not be elaborately specific; it need only enable the searcher to reasonably ascertain and identify the things authorized to be searched for and seized. *Betancourt*, 734 F.2d at 754–55. The reviewing court determines *de novo* whether a warrant lacked the requisite particularity. *United States v. Bradley*, 644 F.3d 1213, 1258-59 (11th Cir. 2011).

"Breadth and particularity are related but distinct concepts." *United States v. Nelson*, No. 20 crim. 353, 2022 WL 18636591, at *7 (E.D.N.Y. Oct. 24, 2022). "Although a lack of particularity can result in a warrant's overbreadth, a broad

warrant does not necessarily lack particularity." *Id.* Here, the affidavit specifically and particularly explained the place to be searched (Cable's AT&T cellphone records) and the evidence to be seized (geolocation data initially for 45 days and subsequently for an additional 45 days). Turning to breadth, in determining whether a warrant is overbroad, courts look to whether there exists probable cause to support the breadth of the search that was authorized." *Nelson*, 2022 WL 18636591, at *7. Here, Cable argues that this case is similar to *Carpenter v. United States*, 138 S. Ct. 2206 (2018). (Doc. 470 at 12; Doc. 503 at 24.) In *Carpenter*, the Supreme Court held that the Fourth Amendment's warrant requirement applies to retrospective collection of cell-site location information for periods of at least seven days. 138 S. Ct. at 2217. Of note, the Eleventh Circuit has not answered the question of whether collection of real-time or prospective location data implicates the Fourth Amendment. *See United States v. Green*, 981 F.3d 945, 958 (11th Cir. 2020) ("The question of whether acquiring [real-time location data] constitutes a search . . . remains unanswered today."). That is, *Carpenter* left open the question of whether the government must obtain a search warrant to receive real-time, cell-site location data like the data sought here. *See United States v. Castellanos*, No. 1:21-cr-348-TWT-JKL, 2023 WL 2466789, at *6 (N.D. Ga. Feb. 17, 2023) (quoting *United States v. Trader*, 981 F.3d 961, 968 (11th Cir. 2020) (concluding that "*Carpenter* should not be extended categorically to all real-time" cell-site location information because "whether a Fourth Amendment violation has occurred [ ] depends on how much data was captured and for how long, and more importantly, what the data reveals about an individual's location

and movements.")). Regardless, here, the government did obtain a search warrant.

The government obtained that warrant under 18 U.S.C. § 2703(c)(1)(A). (Doc. 501-1 at 16.) At least one court, in *In the Matter of the Search of a Cellular Telephone*, 430 F. Supp. 3d 1264, 1271-72 (D. Utah 2019), has found that, as a matter of course, an 18 U.S.C. § 2703(c)(1)(A) warrant authorizing cellphone geolocation data may reasonably order 45 days' worth of geolocation data, to be followed by an additional 45 days' worth of data for good cause shown. The court in that case found that Section 2703(c)(1)(A) warrants authorizing cellphone location data are analogous to GPS tracker warrants, which are authorized under 18 U.S.C. § 3117, given that both warrants allow law enforcement to track movement or location. *Id.* at 1272 ("The tracking warrant procedures transfer well to authorization for prospective location information from a cellular telephone company."). Under Federal Rule of Criminal Procedure 41, a judge may authorize the government to install a GPS tracking device for 45 days, and the court may, for good cause, grant one or more extensions for a reasonable period not to exceed 45 days each. Fed. R. Crim. P. 41(e)(2)(C). This analysis makes sense and provides a basis to summarily reject Cable's overbreadth argument.

Still, even without importing Section 3117's time limits into Section 2703(c)(1)(A), 45 days here was reasonable. The affidavit explained that law enforcement had identified Cable as one of Ruiz's drug coordinators and couriers, and that Cable coordinated communications between the SOI — a drug

22

customer — and Ruiz, who was in prison. During that coordinated call, Ruiz brokered a drug deal. Agents also had intercepted daily calls during which Ruiz brokered other drug transactions on his cellphone from prison and learned that Cable had used her cellphone to contact Ruiz in prison over 1,000 times from November 30, 2019 to January 28, 2020, or for an approximate two-month period. In addition, when the initial warrant's 45-day time limit expired and agents sought an additional 45 days, their request explained that, during the first 45 days of geolocation monitoring, law enforcement was able to identify Cable's residence and vehicles; learned that she visited Ruiz in prison; and determined that she meets drug couriers and then drives them to stash houses to conduct drug transactions. (Doc. 501-2 at ¶ 1). *See Nelson*, 2022 WL 18636591, *13 (holding that a warrant's authorization of 30 days of prospective location data was not overbroad because such data could assist law enforcement in locating and apprehending a target). The undersigned thus finds that the search warrant was not overbroad.

### 3. **Even if the search was unlawful, the *Leon* good faith exception would apply.**

Lastly, Cable asserts that the *Leon* good-faith exception does not apply here because "the warrant was so lacking in probable cause as to render belief in its existence entirely unreasonable." (Doc. 470 at 15.)

In general, evidence seized through an unlawful search must be suppressed. *United States v. Morales*, 987 F.3d 966, 972 (11th Cir. 2021) (citing *Martin*, 297 F.3d at 1312). But when law enforcement officers "obtained and

relied on a warrant from a neutral magistrate and had no reason to think that probable cause was absent despite the magistrate's authorization[,]" the seized evidence should not be suppressed. *Id.* at 974; *United States v. Leon*, 468 U.S. 897, 925 (1984). In *Leon*, the Supreme Court noted that "searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922. The Supreme Court then identified four specific situations in which this good faith exception does not apply, including, as Cable argues here, when the supporting affidavit is "'so lacking in indicia of probable cause as to render official belief in its existence unreasonable.'" *Id.* at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610-611 (1975)). The reviewing court examines whether, based on the totality of the circumstances, a reasonably well-trained officer would have relied on the warrant. *United States v. Taxacher*, 902 F.2d 867, 872 (11th Cir. 1990) (citing *Leon*, 468 U.S. at 922).

As explained above, the warrant is not lacking in probable cause. Certainly, it cannot be said that it is "so lacking" in indicia of probable cause so as to render the officer's belief in it unreasonable. Moreover, as explained above, this Circuit has not answered the question of whether collection of real-time or prospective location data implicates the Fourth Amendment. *See United States v. Green*, 981 F.3d 945, 958 (11th Cir. 2020) Given this, the Eleventh Circuit has held that, assuming without deciding that law enforcement is required to secure a search warrant to obtain prospective geolocation data, the *Leon* good-faith

exception applies because "there was no reason for the officers to believe that" acquiring the information without a warrant violated the Fourth Amendment given that the law "remains unanswered" as to whether the Fourth Amendment is implicated when law enforcement seeks real-time GPS location data from a cellphone. *Green*, 981 F.3d at 958. Thus, even if the search warrant lacked probable cause — which it did not — the evidence seized should not be suppressed.

**D. CONCLUSION**

For the foregoing reasons, the Court **ORDERS** that Cable's motion to reveal the deal, (Doc. 353), be **DENIED.** The Court further **RECOMMENDS** that Cable's motion to reveal confidential source, (Doc. 354), and her motion to suppress geolocation data and related evidence, (Doc. 356), be **DENIED**. Cable has no other motions pending before the undersigned, and all other named defendants' cases have previously been certified. Accordingly, the entire case is **CERTIFIED READY FOR TRIAL**.

**SO ORDERED and RECOMMENDED** September 11, 2023.

J. ELIZABETH McBATH
UNITED STATES MAGISTRATE JUDGE